# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 21-409V

|  |  |
|---|---|
| PATRICIA SMITH,<br><br>     Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>     Respondent. | Chief Special Master Corcoran<br><br>Filed: December 11, 2023 |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Katherine Carr Esposito, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

  On January 8, 2021, Patricia Smith filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on December 16, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

  For the reasons described below I find that Petitioner is entitled to compensation, and I award **$77,000.00**, for past pain and suffering.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.      Relevant Procedural History

Shortly after the claim's initiation, Petitioner filed an amended petition on April 12, 2021. ECF No. 6. On December 1, 2021, Respondent filed a status report stating that a preliminary review of the case did not identify any missing records or issues that required additional support. ECF No. 22. While this case awaited medical review, Petitioner submitted a settlement demand to Respondent on May 10, 2022. ECF No. 28. On June 27, 2022, I ordered Respondent to file a status report regarding his position on settlement by September 15, 2022, and noted that if he did not, Petitioner was permitted to file a motion for a ruling on the record at that time. Non-PDF Order, docketed June 27, 2022.

Petitioner thereafter filed a motion for a ruling on the record regarding entitlement and damages on October 5, 2022. Petitioner's Motion for Ruling on Entitlement and Damages ("Mot."), ECF No. 32. Petitioner argued that she meets the Table definition of a SIRVA, and requested an award of $80,000.00 for actual pain and suffering. *Id.* at 2.

Respondent filed his response and Rule 4(c) Report on October 19, 2022. Respondent's Rule 4(c) Report and Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Opp."), ECF No. 35. Respondent argued, in part, that Petitioner has failed to establish the threshold six-month severity requirement. Opp. at 9-10. Additionally, Respondent argued Petitioner has failed to establish a Table claim because the onset of her shoulder pain did not occur within 48 hours of her vaccine, the record reveals her pain was not limited to her left shoulder, and there is another abnormality present that could explain Petitioner's symptoms. *Id.* at 10-11. Respondent did not brief damages within his response. *Id.* at 11.

Petitioner filed a reply on October 26, 2022, addressing Respondent's arguments regarding entitlement.[3] Petitioner's Reply to Respondent's Rule 4(c) Report and Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Reply"), ECF No. 36. In August 2023, Petitioner filed additional documentation in support of her ability to establish the six-month severity requirement. *See* ECF Nos. 38-40. As ordered, on November 17, 2023, Respondent filed his supplemental brief on damages and proposed an award of no more than $50,000.00 for actual pain and suffering if entitlement is found in favor of Petitioner.[4] Mem. at 5, ECF No. 42. Petitioner filed a supplemental reply brief

---

[3] Petitioner did not file a reply to Respondent's arguments regarding damages at that time, as Respondent's damages brief was ordered and filed after this filing. *See* Mem. at 1-2, ECF No. 42.

[4] Respondent noted that Petitioner's affidavit identifies her as a Medicaid recipient, but the record did not show whether a Medicaid lien exists related to the cost of care for Petitioner's left shoulder injury. Mem. at 1, n.1, ECF No. 42. Petitioner subsequently confirmed that a Medicaid lien does not exist in this case and that was an error in the filings. Informal Comm., docketed Nov. 28, 2023.

on damages on December 1, 2023, reiterating that she has established a Table SIRVA claim and requesting between $70,000.00 and $80,000.00 in pain and suffering. Reply Br. at 1, ECF No. 43. This matter is now ripe for resolution.

## II.    Petitioner's Medical History

Petitioner's medical history was non-contributory. She was a hair stylist "for the majority of her life" and, at the time of vaccination, was working as a school bus/van driver. Ex. 9 at 6; Ex. 2 at 3; Ex. 4 at 9. At age sixty-six, Petitioner received the flu vaccine on December 16, 2019, in her left shoulder. Ex. 1 at 4.

Approximately one month later, on January 13, 2020, Petitioner visited Geisinger Family Practice (a convenient care facility) complaining of a "lump on [her] left arm since she had her flu shot." Ex. 6 at 4. Petitioner stated that the "[p]ain started that night after getting her flu shot" and has been constantly present for "4 weeks." *Id.* Petitioner explained that the pain "comes up into her shoulder, [and she] cannot move her arm." *Id.* She denied numbness and tingling and stated that the "pain stops at the elbow." *Id.* Petitioner noted that home remedies, including icing/heating and ibuprofen, had been ineffective in reducing her pain. *Id.* An examination revealed decreased range of motion ("ROM") and acute pain but "no definite lump [was] identified." *Id.* at 6. An x-ray of her left shoulder showed mild to moderate acromioclavicular osteoarthritis. *Id.* at 10. Petitioner was assessed with acute pain of the left shoulder and prescribed a course of Medrol (steroids). *Id.* at 9-10.

On February 24, 2020, Petitioner returned to Geisinger Family Practice (convenient care) complaining of left shoulder pain that "started December 16." Ex. 6 at 24. The physician noted that Petitioner had "no problems at [the] time of injection. The next day [she] had left upper arm/shoulder pain[, which] has been constant since." *Id.* An examination revealed "no swelling or abnormality noted of left shoulder/upper arm. Full shoulder ROM, but did have pain at end of movement with abduction." *Id.* at 25. Petitioner was assessed with chronic left shoulder pain and was told to follow up with her primary care physician ("PCP"). *Id.* at 26.

Petitioner filed a Vaccine Adverse Event reporting system ("VAERS") report on March 3, 2020. Ex. 8 at 43. The VAERS report was authored by a "[d]octor or other healthcare professional [in an] office/clinic visit" – but no other office notes for this visit appear in the record. *Id.* The report stated that Petitioner noted her pain beginning on "12/16/19," and she described pain and burning at the injection site "radiating to [her] shoulder [and] elbow." *Id.*

The following day, on March 4, 2020, Petitioner visited her PCP at Geisinger PrimeMed "basically to have this documented as well as to see what her options are." Ex. 8 at 17. She reported "continued left arm pain after receiving a high dose flu shot on 12/16." *Id.* Petitioner stated that the steroids helped "short-term but now the pain is back with some radiation, now down her arm into her elbow and up into her shoulder joint." *Id.* A physical examination showed "strength in all extremities 4+ throughout[,]" but was otherwise unremarkable. *Id.* Petitioner was assessed with pain in the left arm and an injection site reaction, and her PCP noted that it is "[u]nclear as to why [Petitioner] is having continued discomfort." *Id.* at 18. The physician was "not sure [if Petitioner's] full nerve was injured or if this is just radiation of discomfort from several [sic] tendinitis." *Id.* Petitioner was prescribed prednisone. *Id.* at 19.

Following this appointment, there occurred a significant, eight-month gap in Petitioner's treatment for left shoulder pain. On November 6, 2020, Petitioner returned to care and underwent an initial physical therapy ("PT") evaluation. Ex. 4 at 12. Petitioner stated her "left shoulder pain started last Dec[ember] 6th [sic] after getting a flu shot." *Id.* She explained that "in March/April [she was] given prednisone" that alleviated the pain but the "pain returned about a month later. She was given prednisone again that helped again." *Id.* Petitioner explained her prednisone usage and reported that she had seen her PCP "in July in person, but had some appointments at a local walk-in clinic and [was] given more prednisone, but only received temporary relief."[5] *Id.* Petitioner stated that the "most recent exacerbation [of pain] occurred a few months ago." *Id.* The onset was noted as June 9, 2020, but "due to[] chronic symptoms." *Id.* Petitioner rated her pain ranging from a 6-10/10, with a present rating of 8/10. *Id.* An examination revealed reduced ROM and strength, and she demonstrated "signs and symptoms consistent with [rotator cuff tear] tendinitis/bursitis with postural deficits." *Id.* at 13. Petitioner attended eight additional PT sessions between November 10, 2020, and December 10, 2020, during which Petitioner reported that her pain and ROM improved gradually. *Id.* at 16-37.

Petitioner established care with a new PCP on December 2, 2020. Ex. 5 at 4. She complained of "[l]eft arm pain from [the] flu shot from last year. [She s]till has pain and weakness in [her] arm." *Id.* A physical examination showed a "tender area [in the] left upper arm with [a] palpable lump." *Id.* at 7. Petitioner received a referral for orthopedics. *Id.*

---

[5] The records for Petitioner's alleged June and July 2020 visits have not been filed, despite Petitioner's contention that such visits occurred. Petitioner filed Exhibit 12 showing that the facility from which she allegedly received a free PT evaluation in June 2020, does not have any records of Petitioner's visit. *See* Ex. 12.

On December 11, 2020, Petitioner had an initial acupuncture evaluation. Ex. 7 at 7. She complained of "left shoulder pain that began 24 hours after receiving [an] influenza injection at her local CVS pharmacy . . . [o]nset 12 months." *Id.* at 12. She described the pain as "aching and burning" and rated such pain at a 6/10. *Id.* at 10. She received trigger point treatment and electroacupuncture. *Id.* at 12. Petitioner attended two additional acupuncture sessions on December 18 and 23, 2020. *Id.* at 13.

Petitioner called her PCP on January 11, 2021, reporting ongoing shoulder pain and inquiring whether she could receive a steroid injection. Ex. 6 at 61. Her PCP told her an orthopedic surgeon would be the appropriate physician to administer that treatment. *Id.*

On January 26, 2021, Petitioner saw an orthopedic surgeon reporting a "1 year history of left upper arm pain. [She n]otes that [the] pain began after receiving a flu vaccine in her left shoulder." Ex. 9 at 6. Petitioner continued, "the pain is a burning/stabbing pain in the lateral aspect of the shoulder with occasional radiation down the upper arm but stops at the elbow. Pain is worse with any forward flexion or abduction of the shoulder." *Id.* On examination, Petitioner exhibited limited ROM in the left shoulder.[6] *Id.* at 8. Petitioner underwent a diagnostic ultrasound and the impression was noted as: 1) significant rotator cuff tendinopathy involving supraspinatus, infraspinatus, and subscapularis; 2) possible partial-thickness tear of the supraspinatus at the anatomic footprint in the background of tendinopathy; 3) subacromial and subcoracoid bursitis; 4) subacromial-subdeltoid impingement; 5) tendinopathy long head of the biceps tendon; and 6) [acromioclavicular] joint arthrosis. *Id.* Petitioner received a corticosteroid injection in her left subacromial-subdeltoid bursa. *Id.* at 9-10.

Approximately five months later, on June 24, 2021, Petitioner followed up with her orthopedic surgeon. Ex. 10 at 5. The physician represented that Petitioner was last seen in March 2021,[7] during which time she reported improvement following her steroid injection. *Id.* Petitioner stated that "[a]pproximately 2 weeks ago[,]" she "began having worsened pain on the lateral aspect of the shoulder without radiation . . . [that] is worse with overhead motions." *Id.* She rated her pain at a 5/10. *Id.* A physical examination revealed tenderness, along with limited active ROM in internal rotation and limited passive

---

[6] Petitioner highlights that this medical record attributes her condition to the right shoulder. Petitioner argues, and Respondent agrees, that based on the totality of the other records, this indication was likely in error and should have referred to the left shoulder, consistent with the bulk of other evidence. Mot. at 8, n.1; Opp. at 7, n.6. I therefore accept Petitioner's argument that this notation was intended for the left shoulder.

[7] The records from this March 2021 visit with Petitioner's orthopedic surgeon do not appear to have been filed.

ROM "in all planes due to pain." *Id.* at 6. Petitioner declined a repeat injection and opted for conservative treatment (ibuprofen, Tylenol, icing, topical gels). *Id.* No additional medical records have been filed.

### III.    Affidavit Evidence

Petitioner attested that "[u]pon receiving the [December 16, 2019] flu shot, [she] experienced some mild but expected pain and soreness. That night, however, the pain exponentially grew to an unpredictable intensity." Ex. 2 ¶ 9. She described a "hot and burning pain at the injection site" and a "lump on [her] shoulder where the shot was administered." *Id.* Petitioner stated that her pain did not subside in the month after her vaccination (despite using hot and cold packs and taking ibuprofen), and she sought treatment at local clinics (in January and February 2020) when "there was no other way to live through the pain[,]" followed by a visit with her PCP on March 4, 2020. *Id.* ¶¶ 9-10, 13, 15. At the time of her March 4, 2020 visit, Petitioner was given prednisone which "helped with the pain and burning while taking it, but the medication did not help solve the long-term pain . . . once the prescription ran out." *Id.* ¶ 15.

Petitioner further attested to ongoing shoulder pain during the gap in treatment apparent in her medical records. Specifically, in June 2020, she stated that she received a referral to PT from her PCP for continued shoulder pain.[8] Ex. 2 ¶ 16. The same month, Petitioner received a free PT evaluation, "where [she] was confirmed to have a rotator injury."[9] *Id.* ¶ 17. Petitioner explained that she did not seek further PT treatment at that time because she had lost her job as a bus driver due to the COVID-19 Pandemic/shutdown and could not afford the payments. *Id.* However, because she regained employment in September 2020, Petitioner was able to begin PT on November 6, 2020. *Id.* ¶ 19.

As of October 1, 2022, at the time her supplemental affidavit was authored (nearly three years post vaccination), Petitioner attested that despite her "extensive medical treatment," she continues to experience "a dull, aching pain [at rest], but on occasion . . . [a] sharp, shooting pain[] even when sitting still." Ex. 11 ¶¶ 5-6. She further reported ongoing limitations in ROM, and estimated she has "lost half" of her ROM. *Id.* ¶¶ 5-7, 9, 11. No matter what Petitioner tried, "the pain always seem[ed] to come back." *Id.* ¶ 11. As

---

[8] The records from this June 2020 visit or communication with Petitioner's PCP do not appear to have been filed.

[9] The records from this June 2020 free PT evaluation do not appear to have been filed. It is also interesting that in Petitioner's November 6, 2020 PT records wherein she references this free evaluation, Petitioner alleges the visit occurred in July of 2020, not June as she describes in her affidavit. *Compare,* Ex. 4 at 12; *with* Ex. 2 ¶ 17.

a result of her continued pain and restricted ROM, Petitioner described ongoing limitations with everyday activities, including putting on a seatbelt, driving, reaching for objects, getting dressed, and sleeping. *Id.* ¶¶ 5, 7-8; Ex. 2 ¶ 23. She also described diminished interest in activities she used to enjoy, including crafting, swimming, and hiking. Ex. 2 ¶ 23.

## IV.    Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[10] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

---

[10] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though

the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### 1. Petitioner Has No Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.

### 2. Onset of Petitioner's Injury Occurred within 48 Hours of her Vaccination

The aforementioned medical records, coupled with Petitioner's affidavits, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that she sought treatment the month after her December 16, 2019 vaccination, and that she indeed was experiencing symptoms in the relevant timeframe. *See,* e.g., Ex. 6 at 4, 24; Ex. 8 at 17; Ex. 2; Ex. 11.

Respondent argues Petitioner cannot establish onset, in part because her closest medical record came twenty-eight days post vaccination, on January 13, 2020. Opp. at 10. More so, even though Petitioner described her pain during that visit as beginning "that

night after getting her flu shot," Petitioner's symptoms "are also more vaguely referenced as beginning simply 'since the flu shot.'" *Id.* (citing Ex. 3 at 4; Ex. 6 at 4).

These objections are ultimately unpersuasive, however, when considered against the totality of the evidence. First, the records show that Petitioner sought treatment in a relatively timely manner (i.e., less than a month after vaccination). It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Here, however, the delay was not appreciably long – and the fact that treatment was sought in a relatively short timeframe is supportive of a close-in-time onset.

Second, Petitioner affirmatively and repeatedly linked her shoulder pain to the flu vaccine – beginning with the January 13th treatment encounter, at which time she noted that her shoulder pain "started that night after getting her flu shot," and that said pain had been present for "4 weeks." Ex. 6 at 4. This reporting provides additional support for onset. Other subsequent medical records also corroborate the contention made in Petitioner's affidavit that Petitioner's pain began within 48 hours of vaccination. *See,* e.g., Ex. 6 at 24 (a February 24, 2020 note complaining of left shoulder pain that "started December 16[, 2019.]"); Ex. 8 at 43 (a March 3, 2020 VAERS report noting onset on "12/16/19"); Ex. 8 at 17 (a March 4, 2020 note stating "continued left arm pain after receiving a high dose flu shot on 12/16."); Ex. 7 at 12 (a December 11, 2020 note reporting onset "24 hours after receiving [an] influenza injection at her local CVS pharmacy . . . [o]nset 12 months.").

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain more likely than not occurred within one day of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain was Limited to her Left Shoulder

I also find that there is a preponderance of evidence that Petitioner's pain was limited to her left shoulder. Petitioner's records consistently report left shoulder pain and loss of ROM, which are consistent with other SIRVA cases. Petitioner's medical procedures were also limited to her left shoulder, and she received treatment for left shoulder pain. *See,* e.g., Ex. 4 at 12; Ex. 6 at 4, 61; Ex. 7 at 12; Ex. 8 at 17; Ex. 9 at 6-10.

Respondent argues that Petitioner's pain extended to her elbow, and focuses on several instances when Petitioner described pain radiating down to her elbow from her shoulder. *See* Opp. at 11 (citing Ex. 8 at 17, 43; Ex. 9 at 6); *see also* Ex. 6 at 4. Although

there are references to pain radiating down Petitioner's left arm in some records, the majority of other records support a finding that Petitioner's pain was limited to her left shoulder and, more so, originated from the shoulder. *See, e.g.*, *Grossman v. Sec'y of Health & Hum. Servs.*, No. 18-13V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (noting that the "third SIRVA criterion is intended to ensure that SIRVA claims are limited to instances in which 'the condition is localized to the shoulder in which the vaccine was administered[,]' . . . [and] that the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced [ROM] indicative of a contributing etiology *beyond* the confines of a musculoskeletal injury to the affected shoulder") (emphasis added); *Werning v. Sec'y of Health & Hum. Servs.,* No. 18-267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020) (finding that a petitioner satisfied the third SIRVA criterion where there was a complaint of radiating pain, but the petitioner was "diagnosed and treated solely for pain and limited [ROM] to her right shoulder."). Further, there is no evidence of neuropathic causes for Petitioner's reports of radiating symptoms, which can thus be distinguished.

### 4.  There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent contends that Petitioner's January 2020 left shoulder x-ray and January 2021 ultrasound show mild to moderate acromioclavicular osteoarthritis/joint arthrosis. Opp. at 11 (citing Ex. 3 at 6; Ex. 9 at 8).

Respondent's argument, however, is at odds with Respondent's agreement that Petitioner did not have a pre-vaccination history of left shoulder pain or injury. Alternatively, Respondent contends that Petitioner's post-vaccination presentation can be explained by Petitioner's chronic, degenerative conditions despite her clinical history suggesting, consistent with a SIRVA, a temporal association with Petitioner's December 16, 2019 flu vaccination. However, Respondent has failed to show that Petitioner's previously asymptomatic degenerative changes otherwise explain her post-vaccination condition to the exclusion of a SIRVA. *Grossman,* 2022 WL 779666, at *18; *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (explaining that "findings consistent with impingement, rotator cuff tears, or [acromioclavicular] arthritis do not *per se* preclude a finding that a Table SIRVA exists. Rather, the question raised by [R]espondent's argument is whether [a] petitioner's own clinical history indicates that her shoulder pathology wholly explains her symptoms independent of vaccination."). Petitioner's clinical course is consistent with onset of a SIRVA, more so than with any eventual manifestation of the chronic, degenerative conditions apparent on diagnostic imaging.

### B. Severity

While Petitioner has satisfied her burden under the QAI for a Table SIRVA, the next issue to be resolved is whether Petitioner has demonstrated that she suffered "residual effects or complications of [the injury alleged] for more than six months after the administration of the vaccine," as required for eligibility under the Vaccine Program. Section 11(c)(1)(D)(i).

There appears to be no dispute that Petitioner received the flu vaccine on December 16, 2019, and she therefore must demonstrate by preponderant evidence that her residual symptoms continued for more than six months thereafter from onset. *See,* e.g., *Herren v. Sec'y of Health & Hum. Servs.*, No. 13-100V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014); *see also Hinnefeld v. Sec'y of Health & Hum. Servs.*, No. 11-328V, 2012 WL 1608839, at *4-5 (Fed. Cl. Spec. Mstr. Mar. 30, 2012) (dismissing case where medical history revealed that petitioner's Guillain-Barré syndrome resolved less than two months after onset).

To satisfy the six-month requirement, "[a] potential petitioner must do something more than merely submit a petition and an affidavit parroting the words of the statute." *Faup v. Sec'y of Health & Hum. Servs.,* No. 12-87V, 2015 WL 443802, at *4 (Fed. Cl. Spec. Mstr. Jan. 13, 2015). Rather, a petitioner is required to "submit supporting documentation which reasonably demonstrates that the alleged injury or its sequelae lasted more than six months[.]" *Id.* Although a petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion, the fact that a petitioner has been discharged from medical care before the expiration of the six-month period does not necessarily indicate that there are no remaining or residual effects from his or her alleged injury. *See,* e.g., *Herren,* 2014 WL 3889070, at *3 (finding that a petitioner suffered from residual symptoms that due to their mild nature did not require medical care).

As discussed above, Petitioner's treatment records and affidavit suggest that the onset of her symptoms began within 48 hours of her December 16, 2019 flu vaccination (likely on the day of vaccination) – or by no later than December 18, 2019. Therefore, she logically must demonstrate that her left shoulder injury continued to or through June 16, 2020.

Petitioner initially sought treatment for her shoulder injury on January 13, 2020, and continued until March 4, 2020, approximately three months post onset. There is then a gap of eight months in the medical records – to November 6, 2020. Respondent maintains that Petitioner "experienced a period of recovery during that time frame," and thus before the June 2020 six-month "deadline." Opp. at 10. Indeed, Respondent notes Petitioner's records reflect that when Petitioner presented to PT treatment in November of 2020, she reported that "a second round of prednisone 'helped again,'" and she

experienced the "most recent exacerbation" of her shoulder pain "a few months ago." *Id.* (citing Ex. 4 at 12).

The record, however, reveals that Petitioner's symptoms *did* continue – even after March 2020 – and that the variability in symptoms was the product of her prednisone usage. For instance, during Petitioner's March 4, 2020 visit (her last appointment prior to the eight-month gap in treatment), Petitioner complained of "continued left arm pain" and that steroids she had received from a walk-in clinic had helped "short-term but now the pain is back with some radiation[.]" Ex. 8 at 17. Petitioner's PCP thus prescribed her prednisone to treat such ongoing symptoms. *Id.* at 19. The fact that Petitioner was prescribed additional prednisone for her symptoms supports that Petitioner's pain was likely not resolved by March 2020, nor was it expected to resolve immediately following this visit.

Further, Petitioner's report on November 6, 2020, that the second round of prednisone "helped again," paired with reports of a recent exacerbation "a few months ago," with "onset due to chronic symptoms" is not inconsistent with continued pain during the gap in treatment – it merely reflects that Petitioner experienced relief when she was taking prednisone. *See* Ex. 4 at 12. It is persuasive that Petitioner reported the same pattern of symptomology attributable to her prednisone use prior to the gap in treatment as she did upon her return to care. *Compare* Ex. 8 at 17 (a March 4, 2020 note describing her history and reporting steroids "did help short-term but now the pain is back"), *with* Ex. 4 at 12 (a November 6, 2020 note describing her history and reporting that "[i]nitially the steroid help[ed] and eliminated the pain . . . the pain returned about a month later. She was given prednisone again that helped again."). Petitioner's reports of pain commensurate with prednisone use thus provides support for Petitioner's vaccine-related pain extending past June 16, 2020.

Also significant to my determination on severity is the fact that when Petitioner did return to care on November 6, 2020, she *consistently* related her pain back to her flu shot she had received the previous year. *See,* e.g., Ex. 4 at 12 (a November 6, 2020 visit note wherein Petitioner reported onset in December of last year "after getting a flu shot"); Ex. 5 at 4 (a December 2, 2020 visit note showing Petitioner reported "[l]eft arm pain from [the] flu shot from last year. [She s]till has pain and weakness in [her] arm"); Ex. 7 at 12 (a December 11, 2020 visit note reflecting onset of left shoulder pain twelve months ago "that began 24 hours after receiving [an] influenza injection"); Ex. 9 at 6 (a January 26, 2021 visit note showing a complaint of a "1 year history of left upper arm pain . . . that [] began after receiving a flu vaccine in her left shoulder"). I have no reason to doubt the accuracy of these records, and I find Petitioner's reports to medical treaters worthy of appropriate weight. *See Cucuras,* 993 F.2d at 1528 (finding medical records warrant consideration as trustworthy evidence as they are "generally contemporaneous to the medical events," and "accuracy has an extra premium" because a patient's "proper

treatment is hanging in the balance."). Such evidence suggests that Petitioner's vaccine-related pain was ongoing during the gap in treatment, through the June 2020 six-month "deadline."

In addition, Petitioner's November 6, 2020 record (wherein Petitioner reported visits and prednisone use during the summer of 2020) also corroborates, albeit weakly, her affidavit wherein she explains that she sought care for her left shoulder symptoms during the summer of 2020. Ex. 4 at 12 (noting that she had an in-person visit in July of 2020, along with "some appointments at a local walk-in clinic and given more prednisone"); Ex. 2 ¶¶ 16-17 (noting she received a referral to PT and a free PT evaluation in June of 2020). I do not give *much* weight to these statements in Petitioner's November 6, 2020 record or the alleged visits during the summer of 2020, as evidence to support them was never filed for my full consideration. Although Petitioner filed Exhibit 12 (a "no records" statement issued by the facility from whom Petitioner allegedly received a free PT evaluation), the record does not confirm whether a visit occurred, whether an evaluation was performed, or if Petitioner had ongoing shoulder pain. Still, I give the November 6, 2020 record some weight and, in conjunction with Petitioner's affidavits, find Petitioner's vaccine-related shoulder pain continued for more than six months post onset.[11]

Furthermore, Petitioner's explanation for why she did not return for treatment for her left shoulder pain during the nearly eight-month period, despite the existence of pain, is persuasive and supported by the record. Petitioner attests that she lost her job as a bus driver in March of 2020, as a result of the COVID-19 Pandemic and related shutdown. Ex. 2 ¶ 14. Due to her lack of employment and inability to afford insurance payments, as well as the ongoing concern caused by the Pandemic (which unquestionably impacted the in-person care individuals were able to receive for at least part of 2020), Petitioner did not seek treatment during this time. *Id.* ¶ 17. When Petitioner regained employment in September 2020, and returned to care in November of that year when she could afford payments, she noted continued pain. *Id.* ¶¶ 18-19. This progression is supported by the record – specifically, that Petitioner's March 4, 2020 visit was a tele-health visit and thus coincides with the beginning of the COVID-19 shutdown (which manifested in the United States most prominently in March 2020). Ex. 8 at 17. I have previously given weight to

---

[11] Petitioner's November 6, 2020 record does contain two inconsistencies about onset. While it reports that the onset of her shoulder symptoms was on "Dec[ember] 6th" following her receipt of a flu vaccine, it also identified onset as June 9, 2020. Ex. 4 at 12. I do not place much emphasis on the December "6th" portion of the visit notes, however, as it is possible that this is a typographical error since Petitioner's vaccination at issue occurred on December 16th. Further, not only is this statement inconsistent with the other notes from this visit (December "6th" vs. June 9, 2020), but it is also incongruous with Petitioner's description of the history of her injury dating back to her December 2019 vaccination – albeit with a recent exacerbation a few months prior. *See id.* Despite the records' inconsistencies, given Petitioner's reported history of her injury during this visit, this notation thus provides support for Petitioner's continuing pain since her vaccination the previous year.

the fact that "at the outset of the [P]andemic, individuals reasonably curtailed (or even avoided) medical treatment for non-emergency matters, and that in many cases this could explain a gap in treatment." *Keeling v. Sec'y of Health & Hum. Servs.,* No. 20-2048V, Slip Op. 32, (Fed. Cl. Spec. Mstr. Oct. 19, 2022).

Otherwise, the lack of evidence of continuous treatment does not prevent a finding that severity of the injury persisted beyond six months of onset. *See,* e.g., *Herren*, 2014 WL 3889070, at *3. The record clearly establishes that Petitioner's pain was commensurate with her use of prednisone and that when this medication ran out, her pain returned. When that occurred, Petitioner was largely unable to seek continued care due to the COVID-19 shutdown and her closely connected loss of employment/inability to afford treatment. Petitioner's statements in her affidavits regarding ongoing pain do not contradict the records themselves, but provide additional context of time and circumstances that lead to her decision to forego formal treatment for eight months. *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1384 (Fed. Cir. 2021).

Thus, after consideration of the entire record, the evidence supports a finding – albeit barely – that severity has been met. (Certainly, however, the treatment gap underscores that this is a mild SIRVA that did not require surgery – and any damages that may be awarded in this case will take such factors into account).

### C.  Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in her left shoulder on December 16, 2019, in Dallas, PA. Ex. 2 ¶ 4; Ex. 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Ex. 2 ¶ 8; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, as determined above, Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.   Damages

The parties have also briefed damages in this case, which is limited to a request for a past pain and suffering award. Petitioner requests between $70,000.00 and $80,000.00 for actual pain and suffering. Mot. at 2; Reply Br. at 1. Respondent proposes an award of no more than $50,000.00 for past pain and suffering. Mem. at 5.

### A.  Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion in Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs*., No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.,* No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.,* No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[12]

### B.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, affidavits, plus all filings submitted by both

---

[12] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing nine prior damages determinations (*T.E., Hartman, Decoretz, Bergstrom, Accetta, Coluccio, Starnes, Mantagas,* and *Miller*),[13] Petitioner requests an award between $70,000.00 to $80,000.00 for actual pain and suffering. Mot. at 26; Reply Br. at 1, 7. She asserts that the severity of her injury is comparable to, and in the "upper range" for, the awards from the aforementioned SIRVA cases. Mot. at 22-26. In particular, Petitioner emphasizes that she has treated with nine PT sessions, at-home exercises, prescription prednisone and Medrol, an ultrasound guided corticosteroid injection, acupuncture therapy, a diagnostic ultrasound, an x-ray and MRI, and numerous visits to her PCP and orthopedist. *Id.* at 22; Reply Br. at 6, 12-14. She notes that she presented within 28 days of her vaccination, and "[o]ver a year and a half post-vaccination, [she] still reported [ROM] limitations, and pain that was a 5/10." Reply Br. at 6 (citing Ex. 6 at 4; Ex. 10 at 5-6). Petitioner further attests that her pain has continued for more than three years and will continue "into the indefinite future[,]" as she "has not fully recovered even with her dedicated attempts at treatment." Mot. at 25-26. Petitioner contends her pain has been severe and consistent, and she has experienced severe limitations in ROM "by 50%." *Id.* at 26 (citing Ex. 11).

Respondent, by contrast, submits that an award of no more than $50,000.00 is appropriate for pain and suffering. Mem. at 5.[14] Respondent maintains that although the parties dispute the severity of the injury given the break in treatment, it is undisputed that

---

[13] *T.E. v. Sec'y of Health & Hum. Servs.*, No. 19-633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $70,000.00 for actual pain and suffering); *Hartman v. Sec'y of Health & Hum. Servs.*, No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) (awarding $75,000.00 for actual pain and suffering); *Decoretz v. Sec'y of Health & Hum. Servs.*, No. 19-391V, 2021 WL 2346468 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $75,000.00 for actual pain and suffering); *Bergstrom v. Sec'y of Health & Hum. Servs.,* No. 19-784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021) (awarding $80,000.00 for actual pain and suffering); *Accetta v. Sec'y of Health & Hum. Servs.,* No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (awarding $95,000.00 for actual pain and suffering); *Coluccio v. Sec'y of Health & Hum. Servs.,* No. 19-1684V, 2022 WL 17849579 (Fed. Cl. Spec. Mstr. Dec. 15, 2022) (awarding $80,000.00 for actual pain and suffering); *Starnes v. Sec'y of Health & Hum. Servs.,* No. 20-1514V, 2023 WL 8110730 (Fed. Cl. Spec. Mstr. Oct. 13, 2023) (awarding $78,000.00 for actual pain and suffering); *Mantagas v. Sec'y of Health & Hum. Servs.,* No. 20-1720V, 2023 WL 4573855 (Fed. Cl. Spec. Mstr. June 14, 2023) (awarding $75,000.00 for actual pain and suffering); *Miller v. Sec'y of Health & Hum. Servs.,* No. 20-959V, 2023 WL 4312920 (Fed. Cl. Spec. Mstr. June 1, 2023) (awarding $80,000.00 for actual pain and suffering).

[14] Respondent argues that Petitioner is not entitled to compensation in this case but contends no more than $50,000.00 is just and fair compensation if the Court finds that Petitioner satisfies the legal prerequisites of entitlement.

Petitioner last sought care for her shoulder injury eighteen months from the date of her vaccination – on June 24, 2021. *Id.* at 3 (citing Ex. 10 at 5-6). He highlights this visit occurred five months after her last orthopedic follow up, and after the filing of the Petition as well. *Id.* Petitioner should thus receive only a modest award, given her conservative treatment course. *Id.* (citing Ex. 3 at 6; Ex. 8 at 19; Ex. 9 at 9; Ex. 4; Ex. 7 at 5, 7-13). Respondent cites to four cases (*Thomson, Merwitz, Rayborn,* and *Knauss*)[15] in support of his argument. *Id.* at 3-5.

The filed record in this case establishes that Petitioner suffered a moderate SIRVA overall, with fairly significant pain upon onset. Particularly relevant to my decision includes the evidence demonstrating Petitioner's treatment at a walk-in clinic within one month of her vaccination, subsequent treatment with prescriptions for a Medrol dosepak and prednisone, an x-ray, a diagnostic ultrasound (showing significant rotator cuff tendinopathy involving supraspinatus, infraspinatus, and subscapularis; a possible partial-thickness tear of the supraspinatus at the anatomic footprint in the background of tendinopathy; subacromial and subcoracoid bursitis; subacromial-subdeltoid impingement; tendinopathy long head of the biceps tendon; and acromioclavicular joint arthrosis), one corticosteroid injection, participation in nine PT sessions, and three acupuncture sessions.[16] Additionally, while Petitioner's medical records do not contain descriptions of her pain on a ten-point scale at her first post-vaccination visits, in records containing such descriptions she rated her pain ranging from 6-10/10, 8/10, subsequently decreasing to a 5-6/10, then a 5/10 by the end of her formal treatment course (totaling 18 months with an eight-month gap in treatment). *See,* e.g., Ex. 4 at 12 (a November 6, 2020 note reporting typical pain at a 6-10/10 but 8/10 at present); Ex. 4 at 16 (a November 10, 2020 note reporting pain at a 5/10); Ex. 7 at 10 (a December 11, 2020 note reporting pain at a 6/10); Ex. 10 at 5 (a June 24, 2021 note reporting pain at a 5/10). Such notations support a moderately severe SIRVA, with residual pain at the conclusion of her treatment.

Additionally, Petitioner suffered from reduced ROM that was initially reported soon after her vaccination. Her reduced ROM was documented on examination at Petitioner's

---

[15] *Thomson v. Sec'y of Health & Hum. Servs.,* No. 22-234V, 2023 WL 3243536, at *4-5 (Fed. Cl. Spec. Mstr. May 4, 2023) (awarding $82,000.00 for pain and suffering); *Merwitz v. Sec'y of Health & Hum. Servs.,* 20-1141V, 2022 WL 17820768, at *6 (Fed. Cl. Spec. Mstr. Nov. 14, 2022) (awarding $50,000.00 for pain and suffering); *Rayborn v. Sec'y of Health & Hum. Servs.,* No. 18-226V, 2020 WL 5522948, at *12-13 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,000.00 for pain and suffering); *Knauss v. Sec'y of Health & Hum. Servs.,* No. 16-1372V, 2018 WL 3432906, at *7 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering).

[16] Petitioner, in making her argument in support of her claim for pain and suffering, also relies on her receipt of an MRI. *See,* e.g., Reply Br. at 6. However, it does not appear from the record that Petitioner *in fact* received an MRI, and therefore this contention warrants less weight.

first post-vaccination visit and consistently thereafter.[17] *See,* e.g., Ex. 6 at 6 (a January 13, 2020 examination revealing decreased ROM); Ex. 4 at 13 (a November 6, 2020 examination showing decreased ROM); Ex. 9 at 8 (a January 26, 2021 examination wherein Petitioner exhibited limited ROM); Ex. 10 at 6 (a June 24, 2021 examination identifying limited active and passive ROM). The medical records thus show that Petitioner's limitations in ROM continued to an extent. While said records do not fully support Petitioner's assertion made in her affidavit that her ROM was permanently reduced to 50%, there is evidence in the medical records that her restricted ROM was ongoing through *at least* June 2021.

Further, regarding duration, the record supports by preponderant evidence that Petitioner's treatment course and ongoing symptoms continued for approximately eighteen months. Although Petitioner alleges in her affidavit that her pain has continued for more than three years, I cannot fully accept this argument, as there are no contemporaneous treatment records after June 24, 2021 (eighteen months post vaccination). While I credit Petitioner's assertions in her affidavit that she has continued to experience residual symptoms of her SIRVA, including pain and limited ROM, her overall recovery has been fairly good overall – a fact supported by her lack of continued formal treatment contained in the medical records. Indeed, Petitioner's assertions in her affidavit underscore that her lingering symptoms, although present, were manageable with conservative treatment without requiring her return to further formal treatment. I thus find the duration of Petitioner's SIRVA was approximately eighteen months.

The severity and duration of Petitioner's pain, although significant (at times) and fairly lengthy, is offset by the (at least one) long temporal gap in her treatment. When medical records filed for petitioners in the Program reveal comparable gaps, I weigh the reason for the gaps against evidence of a petitioner's purported pain. As discussed above, the timing and explanation for Petitioner's gap in treatment can be explained by the COVID Pandemic. Otherwise, I typically deem the decision to forego treatment as evidence that heavily underscores the mildness of the injury, since it could be endured without medical assistance for periods of time.

The overall severity and duration of the injury at issue herein is ultimately distinguishable from Respondent's cited cases. For instance, in *Merwitz*, the petitioner waited *three months* before seeking care, treated for a total of eight months, often described her pain as intermittent, and had almost full ROM but stiffness at the time of her last visit. 2022 WL 17820768, at *6-15. Likewise, the *Rayborn* petitioner did not seek

---

[17] Petitioner did have one treater note on examination on February 24, 2020, that she exhibited "[f]ull shoulder ROM, but [] pain at end of movement with abduction." Ex. 6 at 25. Considering the bulk of other evidence of examinations showing limited ROM, I do not find this notation detracts significantly from Petitioner's purported decreased ROM.

treatment for four months post vaccination and treated for a total of nine months with a pain level ranging from 2-6/10. 2020 WL 5522948, at *12-13. Finally, the petitioner in *Knauss* also did not seek care until three months post vaccination, had full ROM within five months post onset, rated the pain at a 1/10 (at most), and like Petitioner, had a significant gap in treatment. 2018 WL 3432906, at *7. While *Knauss* is the closest of Respondent's cases to Petitioner's factual circumstances (given the gap in treatment), the severity and duration of Petitioner's injury merits a higher award than each of these cases. Petitioner sought care within one month of vaccination, and has proven ongoing symptomology eighteen months post vaccination.

The cases relied upon by Petitioner are, by contrast, more instructive – but the severity of Petitioner's injury does not quite warrant the $80,000.00 sum requested by Petitioner. For instance, Petitioner and the petitioner in *Bergstrom* experienced moderate and severe pain levels, and both petitioners treated for at least one year. *See* 2021 WL 5754968. However, the *Bergstrom* petitioner received objectively more treatment than Petitioner – two cortisone injections and twenty-one sessions of PT – approximately double Petitioner's one injection and nine PT sessions. *See id.* Similarly, the *Miller* petitioner received two cortisone injections and underwent twenty-four PT sessions. *See* 2023 WL 4312920. The *Miller* petitioner also treated for ten months but experienced an additional six months of pain. *See id.* Although Petitioner has experienced pain and residual effects of her SIRVA for longer than the *Bergstrom* and *Miller* petitioners, her more conservative treatment course speaks to a *slightly* lower award.

Indeed, the severity of Petitioner's injury is more akin to other cases she relied upon, where $75,000.00 for past pain and suffering was awarded. *See Hartman,* 2022 WL 444456*; see also Decoretz*, 2021 WL 2346468. In fact, this case is most factually analogous to *Mantagas*. In *Mantagas*, the petitioner sought treatment within two months of vaccination, rated his pain at a 6/10 (moderate level) throughout his treatment, attended thirteen PT sessions, had a low-grade linear tear, and treated for eleven months with "moderately severe pain," that persisted for another eighteen months, including a substantial gap in treatment due to the COVID Pandemic. *Mantagas v. Sec'y of Health & Hum. Servs.,* No. 20-1720V, 2023 WL 4573855 (Fed. Cl. Spec. Mstr. June 14, 2023). I found *Mantagas* experienced a manageable, ongoing injury for this entire duration – similar to Petitioner here. I will award *slightly* more than the petitioner in *Mantagas*, due to Petitioner's documented significant pain levels (6-10/10 and 8/10) nearly one year post vaccination on November 6, 2020, her receipt of a cortisone injection, three sessions of acupuncture treatment, and her residual pain and ROM restrictions more than eighteen months post onset.

As noted above, I have concluded that Petitioner suffered a moderately significant injury, which was initially complicated by the Pandemic, and persisted over a longer period of time with lingering symptoms. Based on review of the case evidence and in my experience, I find that $77,000.00 is an appropriate award for Petitioner's actual pain and suffering.

## Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of her vaccine, her pain was limited to her left shoulder, and there is no alternate condition that would explain Petitioner's symptoms. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$77,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[18]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[18] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).